NOT FOR PUBLICATION                                    [Dkt. Ent. 11]

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY
### CAMDEN VICINAGE

```
                                   :
ALICIA RODRIGUEZ-PAGAN,            :
        Plaintiff,                 :    Civil No. 10-4273
                                   :
        v.                         :
                                   :    OPINION
MICHAEL J. ASTRUE,                 :
Commissioner of Social Security,   :
                                   :
        Defendant.                 :
                                   :
                                   :
```

Appearances:

        Robert A. Petruzzelli, Esq.
        Jacobs, Schwalbe & Petruzzelli, P.C.
        Woodcrest Pavilion
        10 Melrose Avenue, Suite 340
        Cherry Hill, NJ 08003
            Attorney for Plaintiff

        Amanda J. Lockshin, Esq.
        Special Assistant U.S. Attorney
        United State's Attorney's Office
        c/o Social Security Administration
        26 Federal Plaza, Room 3904
        New York, NY 10278
            Attorney for Defendant


**Bumb**, United States District Court Judge.

        Plaintiff Alicia Rodriguez-Pagan ("Plaintiff") seeks review

pursuant to 42 U.S.C. § 405(g) of the Commissioner of Social Security's (the "Commissioner's") final decision denying her claim for disability insurance benefits ("DIB").  Plaintiff filed a motion for summary judgment, and the Commissioner opposed that motion.  For the following reasons, the Court denies Plaintiff's motion and remands the case to the administrative law judge ("ALJ") for further proceedings.

**I. BACKGROUND**

    **A.   Procedural History**

Plaintiff filed an application for DIB on April 17, 2006, alleging disability beginning January 21, 2006, due to a back injury, herniated spine problem, and dizziness.  (Administrative Record ("R.") 140-44, 155-63.)  The claim was initially denied and again denied on reconsideration.  (R. 69-73, 76-78.)  On January 7, 2008, Plaintiff requested a hearing.  (R. 79.)  As part of her appeal, she submitted a disability report on October 30, 2008, which listed new disabilities, including problems associated with her hands, her right knee, and right shoulder.  (R. 219-26.)  She stated that she had had surgery on both hands for carpal tunnel syndrome and that she had also had surgery on her shoulder and planned to have surgery on her knee.  (R. 219.)  Despite the surgeries, she reported still having pain and "lack of feeling" in her hands and shoulder, which

caused her to need help washing her hair and getting dressed.  (R. 223.)

The administrative hearing was held on August 19, 2009, before ALJ Daniel N. Shellhamer.  (R. 40-63.)  Plaintiff, who was represented by counsel, appeared and testified at the hearing, as well as Mitchell A. Schmidt, an impartial vocational expert.  (R. 22.)

The ALJ issued a decision denying Plaintiff's claim on September 30, 2009.  (R. 16-35.)  The ALJ first determined that Plaintiff's earnings record shows that she had acquired sufficient quarters of coverage to remain insured through March 31, 2011, well after the disability onset date, so she met the insured status requirements of the Social Security Act.  (R. 24.)

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her disability onset date of January 21, 2006.  (R. 24.)  At step two, he determined that she suffered from a back disorder, which was her only "severe", or medically determinable, impairment.  (R. 24.)  At step three, he found that she did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Pt. 404, Subpart P, App. 1.  (R. 27.) Before considering step four, the ALJ determined that despite her

3

impairments, Plaintiff had the residual functional capacity ("RFC")
to perform light work as defined in 20 C.F.R. 404.1567(b), with some
non-exertional limitations.  (R. 27.)  At step four, the ALJ found
that in light of Plaintiff's RFC, she was unable to perform any of
her past relevant work as a secretary, packer, teacher's aide,
housekeeper, or home health aide.  (R. 33.)  At step five, the ALJ
concluded that Plaintiff could perform jobs that exist in significant
numbers in the national economy, including sedentary unskilled
positions like nut sorter or assembler.  (R. 34.)  He based his
opinion upon Plaintiff's RFC, age, education, work experience, and
in conjunction with the Medical-Vocational Guidelines, 20 C.F.R. §
404, Subpt. P, App. 2, and the vocational expert's testimony.  (R.
34-35.)  Thus, the ALJ concluded that Plaintiff was not under a
disability as defined in the Social Security Act.  (R. 35.)

Plaintiff sought review of the ALJ's decision on October 21,
2009.  (R. 13.)  The Appeals Council denied Plaintiff's request on
July 13, 2010.  (R. 1-7.)  Accordingly, the ALJ's decision became
the final decision of the Commissioner for purposes of judicial
review.  See 20 C.F.R. § 404.981.  On August 20, 2010, Plaintiff
filed the above-captioned action in this Court.  [Dkt. Ent. 1.]
Plaintiff filed a brief pursuant to Local Rule 9.1 on February 11,
2011, in which she moved for summary judgment.  [Dkt. Ent. 11.]  The

Commissioner filed a brief in opposition on March 14, 2011 [Dkt. Ent. 12], and Plaintiff never filed a reply.

**B.   Evidence in the Record**

1. The Hearing

At the time of the administrative hearing on August 19, 2009, Plaintiff was 41 years old, five feet, six inches tall, and weighed 310 pounds.  (R. 44.)  She testified that she attended three years of college and received an x-ray technician degree in Puerto Rico. (R. 46.)  She also stated that she went to medical secretarial school for three and a half years and that she understood some English but could not write any.  (R. 46-47.)  She testified that she has been living in the United States since 1995, and lives with her husband and children, ages two and four.  (R. 45.)  Plaintiff testified that she previously worked at Loving Care, where she gave direct patient care to people in their homes, at Bishop McCarthy Nursing Home, where she performed housekeeping, and at Cherry Hot, where she stuffed hot peppers while standing or sitting at an assembly line.  (R. 47-49.) She also testified that she worked as a teachers' aide and as a municipal clerk in Puerto Rico.  (R. 47-48.)

Plaintiff testified that she had surgery on her hands for carpal tunnel syndrome, but that she still has numbness and charley horses. (R. 49.)  She testified that as a result, she has difficulty driving

5

and will only drive to the church or post office, and when she has to drive a distance, she will have someone drive her.  (R. 45.)  She also reported difficulty picking up items like milk or a pot because she does not feel the objects due to numbness.  (R. 50.)  She said that due to the discomfort in her wrists, she does not think she could pack or stuff peppers because her fingers remain stiff.  (Id.)  She also stated that she has been diagnosed with arthritis.  (Id.)

Plaintiff testified that she recently had surgery on her right shoulder, but it is now worse than before, and she has been told it is due to arthritis.  (R. 50-51.)  She stated that it is now difficult for her to lift things and perform tasks such as dressing, putting on underwear, and doing her hair.  (R. 51.)

Plaintiff also testified that she can only walk two blocks and stand for ten minutes or less.  (R. 52.)  She stated that she constantly wears a brace.  (Id.)  She also reported that she can only sit for ten minutes, and then she must get up and move around to relieve the pain, which radiates to her right leg.  (R. 52-53.)  She testified that she was sitting at the edge of her seat because it is more comfortable.  (R. 53.)

Plaintiff also testified that she has neck problems and that Dr. Soloway diagnosed her with fibromyalgia.  (Id.)  She stated that she spends her days at home, and her mother is always at her house

6

to help with her children.  (R. 55.)  She testified that during the day, she sits and lies down.  (Id.)

Plaintiff testified that her problems began while working for the county in 2003, when a child pulled a chair out from behind her, and she fell to the floor.  (R. 56.)  She stated that she filed a worker's compensation case, which settled.  (R. 56-57.)  Her back pain caused her to file for Social Security Benefits in April 2006.

Mitchell Schmidt, the vocational expert ("VE"), testified that Plaintiff's past work ranged between the categories of "sedentary" and "medium" and "skilled" and "unskilled."  (R. 59-60.)

The ALJ asked the VE to consider a hypothetical individual of similar age, education and past work experience as the claimant, with limited use of English, who was restricted to sedentary work and only "occasional fine fingering and handling", where the work involved simple routine instructions, repetitive tasks, simple work-related decisions, some common sense, but only minor or few work changes in a routine work setting.  (R. 60-61.)  The VE testified that there would be no jobs that fit that profile, because the jobs at the sedentary unskilled level that would have only occasional handling and fingering would require communication.  (R. 61.)  The ALJ noted that he had to consider Plaintiff's problem with her hands given the time at which it arose.  (R. 61.)  However, he then told the VE to

7

reconsider the hypothetical <u>without</u> the limitation of only occasional handling and fingering.  (<u>Id.</u>)  The VE then responded that Plaintiff could perform the occupation of nut sorter or final assembler of eyeglasses.  (<u>Id.</u>)

### 2. Relevant Medical Records

On April 19, 2006, Plaintiff saw Dr. Stephen Soloway for the first time in eighteen months, with complaints of pain in her back, knees, and hands.  (R. 354.)  Examination revealed presacral trigger point pain and tenderness, but neurovascular status was intact.  (R. 354.)  Plaintiff was morbidly obese.  (R. 354.) Dr. Soloway injected Plaintiff's trigger points with Depo-Medrol, prescribed Darvocet and Naprosyn, and recommended physical therapy. (R. 354.)  Lumbar spine x-rays revealed dextroscoliosis and straightening of lordosis; knee x-rays indicated bilateral mild osteoarthritis; and elbow x-rays revealed no abnormality. (R. 355.)

On April 26, 2006, Plaintiff complained of left elbow pain.  (R. 353.)  Her examination was otherwise unremarkable; she "appear[ed] well," and her back pain had improved.  (R. 353.)  Dr. Soloway diagnosed lateral epicondylitis, commonly known as tennis elbow. (R. 353.)  He injected her elbow, and prescribed Darvocet and physical therapy for her lower back.  (R. 353.)  On June 5, 2006, Plaintiff complained of neck pain and an injury to her left elbow.

(R. 352.)  She had decreased range of motion in her elbow and neck muscle spasm and tenderness for which she received an injection.  (R. 352.)  She again "appear[ed] well".  (R. 352.) Magnetic resonance imaging (MRI) of the cervical spine revealed mild narrowing of the right neuroforamen at the C3-C5 levels, with a central disc protrusion at C5-C6.  (R. 350.)  A left elbow MRI revealed minimal joint effusion but no bone or soft tissue abnormality.  (R. 351.)

On June 19, 2006, Plaintiff complained only of left elbow pain, for which she received an injection.  (R. 349.)  Dr. Soloway noted that Plaintiff's elbow MRI was normal and cervical spine was "adequate".  (R. 349.)

Plaintiff's left elbow pain was "much better" by July 13, 2006. (R. 348.)  She complained of right elbow pain, but had full range of motion bilaterally.  (R. 348.)  Dr. Soloway again injected her elbow, and again recommended physical therapy.  (R. 348.)

On September 21, 2006, Plaintiff reported "pain all over" but had no fever, constitutional symptoms, Raynaud's, sicca, muscle weakness, dysphagia, or shortness of breath, and her elbows were better following the earlier injections.  (R. 329.)  Dr. Soloway noted "fibromyalgic pain" and ordered a follow up in one month.  (R. 329.)  He prescribed Ambien, Elavil and tramadol, and again suggested physical therapy.  (R. 329.)

9

Despite Plaintiff's complaints, Dr. Soloway completed an assessment the same day in which he stated that she could walk at a reasonable pace and had nearly full (4/5) strength bilaterally. (R. 331.)  She had normal grip strength, could extend her hand, make a fist and oppose her fingers bilaterally; she also was able to separate papers and fasten buttons.  (R. 331.)  She had full range of motion in her shoulders, elbows, wrists, knees, hips, ankles and cervical spine.  (R. 330-331.) She could squat, walk on heels and toes, and had no sensory or reflex loss.  (R. 331.)

Cervical spine x-rays on October 3, 2006 revealed "minimal" degenerative changes, with a "tiny" spur at C5.  (R. 408.)  Right shoulder x-ray revealed no abnormality.  (R. 409.)

Plaintiff was consultatively examined by orthopedist Dr. Nithyashuba Khona on October 17, 2006.  (R. 286-88.)  Plaintiff said her main problem was severe neck and back pain, but was unable to describe this further.  (R. 286.)  She also alleged a history of depression and anxiety following a back injury in 2003.  (R. 286.) Medications included Celebrex, amitriptyline, etodolac, naproxen, Cymbalta, tramadol, dicyclomine, and propoxyphene napsylate with acetaminophen (propoxy-N/APAP).  (R. 286-87.)

Plaintiff lived with her husband and one-year-old child.  (R. 287.)  She cooked twice a week, showered and dressed daily, and cared

10

for her child with help from her mother.  (R. 287.)  She listened
to the radio and went to church, but claimed she had no friends.  (R.
287.)

Plaintiff was five feet, six inches tall and 210 pounds.  (R.
287.) Her gait was slow, but normal.  (R. 287.)  She needed no help
changing or getting on and off the examination table, and was able
to rise from a chair without difficulty.  (R. 287.)  She refused to
squat or walk on heels and toes, saying both would cause her pain.
(R. 287.)  Her hand and finger dexterity were intact, and grip
strength was full (5/5) bilaterally.  (R. 287.)  However, she
refused to lie down or move her shoulders, spine, or legs as she said
this would cause her pain.  (R. 287-88.)  Dr. Khona did examine
Plaintiff's back for tenderness, and noted no sacroiliac joint or
sciatic notch tenderness, no spasm, and no obvious scoliosis or
kyphosis.  (R. 288.)  Dr. Khona assessed that Plaintiff's reported
pain was out of proportion when he touched her back for palpation.
(R. 288.)  He could not offer a prognosis because of the limited
examination.  (R. 288.)

Plaintiff saw Dr. Timothy Rhyme on October 16, 2006, with
complaints of wrist, neck, and shoulder pain.  (R. 407.) Dr. Rhyme
continued her Ultram (tramadol) prescription and added Celebrex.
(R. 407.)

11

Plaintiff saw Dr. Soloway on October 19, 2006, with complaints of neck and back pain.  (R. 327.)  Upon examination, she "appear[ed] well" despite splenius capitis tender points (at the back of her neck) that were worse with range of motion and for which she received an injection.  (R. 327.)  The examination was otherwise unremarkable. (R. 327.)  Dr. Soloway again recommended physical therapy, and medications including Ambien, Elavil and tramadol, which Plaintiff appeared not to have started.  (R. 327.)  Cervical spine x-ray revealed reversal of cervical lordosis, spondylitic changes, and narrowing at C6-C7.  (R. 328; but see R. 408.)

On November 2, 2006, Plaintiff complained only of low back pain. (R. 326.)  She had pain with lumbar spine motion and some paravertebral spasm, but "appear[ed] well".  (R. 326)

State agency physician Dr. Jose Acuna completed a Physical Residual Functional Capacity Assessment form on December 12, 2006, which was later affirmed by Dr. Martin Sheehy.  (R. 207, 289-96.) Dr. Acuna noted that Plaintiff alleged a history of back injury with herniated nucleus pulposus (herniated disc), and that medical evidence of record included a history of a small right paracentral disc herniation at L4-L5, impinging on the nerve root, as well as lumbar spine facet osteoarthritis.  (R. 290; see R. 251, 255, 458, 459.)  He also considered that Plaintiff alleged depression,

12

anxiety, low back pain, neck pain, right hip pain, headaches, dizziness, inability to lift, difficulty in changing positions, and shoulder tightness.  (R. 290; see R. 156, 243.) He noted that she exhibited some problems with positional changes at the field office. (R. 290; see R. 153.)  He considered that she was self-sufficient in her activities of daily living, although slowed, and that she was able to drive and perform light chores.  (R. 290; see R. 164-71, 196, 199-204.)  Dr. Acuna further noted that Plaintiff said she could lift up to fifteen pounds, and walk twenty minutes before tiring.  (R. 290; see R. 169.)  He considered that her low back pain had improved as of April 2006, although she received an injection for left lateral epicondylitis and knee x-rays showed mild osteoarthritis.  (R. 290, see R. 353, 355.)  Dr. Acuna further considered that in July 2006, Plaintiff received an injection for right epicondylitis, but reported her left elbow pain was much improved.  (R. 290-91; see R. 348.)  In September 2006, Plaintiff was able to walk at a reasonable pace, and had lower extremity strength that was nearly full at 4/5, with otherwise unremarkable examination.  (R. 291; see R. 330-31.) Dr. Acuna noted that Plaintiff alleged arthritis and back pain when examined by Dr. Khona in October 2006, but was unable to provide details.  (R. 291; see R. 286.)  He considered that she declined much of the examination, and had no spasm with an exaggerated response

13

to palpation.  (R. 291; <u>see</u> R. 288.)

Based on his review of the record, Dr. Acuna assessed that Plaintiff's symptoms of lumbar back pain, neck pain, and right hip pain were attributable to medically determinable impairments.  (R. 294.)  However, he assessed that the severity of her symptoms and their alleged effect on function was only partially consistent with the total evidence, as a history of chronic headaches, dizziness, inability to lift, and shoulder tightness were not corroborated by review of the total evidence and objective findings.  (R. 294.)  He again noted that Plaintiff exhibited a "significant degree of symptom magnification" and could not describe her pain when seen by Dr. Khona.  (R. 294.)  Plaintiff saw Dr. Jennifer Lane Vanderbeck on October 17, 2007, with complaints of shoulder pain and difficulty lifting her three-month-old child.  (R. 555.)

Given the total evidence, Dr. Acuna opined that Plaintiff could occasionally lift twenty pounds and frequently lift ten pounds, and could stand and/or walk for six hours as well as sit for six hours in an eight-hour workday.  (R. 290-91.) He opined that she should avoid frequent pushing and pulling with upper extremities; could not climb ladders, ropes, and scaffolds; could only occasionally stoop, kneel, crouch, crawl, and climb ramps or stairs; and should avoid concentrated exposure to vibration and hazards.  (R. 290-91, 293.)

14

On January 19, 2007, Plaintiff was consultatively examined by psychologist Dr. Lewis Lazarus.  (R. 297-299.)  Her aunt drove and provided translation.  (R. 297.)  Plaintiff reported symptoms of depression with excessive worry and nervousness, but no panic attacks.  (R. 298.) She also complained of short-term memory problems and difficulty concentrating.  (R. 298.)  She had never received inpatient or outpatient psychiatric treatment.  (R. 297.) Medications included propoxy-N/APAP, tramadol, amitryptyline, Cymbalta, etodolac, and naproxen.  (R. 297.)

With respect to her activities of daily living, Plaintiff could dress, bathe and groom herself, but said she had some trouble with lower extremity dressing and bending.  (R. 298.)  She cooked and prepared meals, but said she did not clean, do laundry, shop, or manage money.  (R. 298; but see R. 164-71.)  She spent time with her family, and had some friends from church.  (R. 298.)  She was able to drive.  (R. 298.)

Upon examination, Plaintiff was cooperative and friendly, with adequate social skills and manner of relating.  (R. 298.)  Her gait was normal, although her posture was tense and motor behavior restless secondary to pain.  (R. 298.)  Eye contact was appropriate and speech unremarkable; thought processes were coherent and goal-directed, with no evidence of delusions, hallucinations, or

15

paranoia; and she had full affect including laughter.  (R. 298.)
Plaintiff's recent and remote memory skills appeared compromised,
in that she was able to recall three out of three objects immediately
but none after a five to ten minute delay, but her attention and
concentration were intact.  (R. 298.)  She could count, and perform
simple calculations and serial threes.  (R. 298.)  Dr. Lazarus
estimated that her intellectual functioning was in the low average
to average range.  (R. 298.)  She understood and spoke some English.
(R. 298.)

Dr. Lazarus diagnosed adjustment disorder with mixed anxiety
and depressed moods, pain disorder associated with both
psychological factors and a general medical condition, and noted her
report of a herniated disc.  (R. 298.)  He opined that her prognosis
was largely dependent upon her physical condition, and that
vocational opportunities might be limited by her language skills and
apparent physical limitations.  (R. 299.)  He assessed that
Plaintiff would be able to manage her funds, although her husband
currently did so.  (R. 298.)

State agency psychologist Dr. Carol Bruskin completed both a
Psychiatric Review Technique form and a Mental Residual Functional
Capacity (MRFC) Assessment form on January 24, 2007.  (R. 300-16.)
She opined that Plaintiff's condition did not meet or equal a listed

16

impairment, with particular attention to listing 12.04 for affective disorders and 12.06 for anxiety-related disorders.  (R. 300.)  Dr. Bruskin noted Plaintiff's allegations of back injury, herniated disc and dizziness, and described and considered evidence from consultative psychologist Dr. Lazarus.  (R. 316.)  Dr. Bruskin noted that Plaintiff's activities of daily living were unremarkable except for difficulties caused by her back impairment, and that she was able to drive, socialize, shop, and care for her small child. (R. 316.)  Based upon her review of the record, Dr. Bruskin opined that Plaintiff could maintain concentration, persistence and pace, and was able to understand, remember, and execute responsibilities associated with a work environment.  (R. 316.)  Plaintiff also could accept criticism from authority, relate to others, and cope with stress or change with only mild to moderate interference from psychiatric symptoms.  (R. 316.)  Dr. Bruskin's opinion was later affirmed by psychologist Dr. Jane Curran.  (R. 208.)

On March 19, 2007, Plaintiff saw Dr. Rhyme with complaints of hand numbness and cramping as well as dropping things.  (R. 394.) She was nearly six months pregnant.  (R. 465.)

Neurologist Dr. Sharan Rampal examined Plaintiff on April 2, 2007.  (R. 465-66.)  Plaintiff was alert, oriented and appropriate, with normal speech and thought.  (R. 465.)  She was able to remember

three out of three objects after three minutes, and had no impairment
in remote memory. (R. 465.) She had mild cervical tenderness and
patchy tenderness over her wrists and elbows; Tinel's sign and
Phalen's sign were positive bilaterally, suggesting carpal tunnel
syndrome (CTS). (R. 465.) Electromyography ("EMG") and nerve
conduction studies (NCV) revealed severe CTS, greater on the right
than left. (R. 463-64, R. 582-83.)

On May 10, 2007, Plaintiff saw Dr. Rhyme with complaints of
aching, soreness and numbness in her hands. (R. 462.) Examination
revealed normal, symmetrical muscle tone and power, with
unremarkable gait. (R. 462.) Plaintiff had dysesthesia over both
palms, with positive Tinel's sign at wrists and elbows bilaterally,
and no extinction or intention tremor. (R. 462.) She wanted to
await delivery of her child before considering any intervention for
CTS. (R. 462.)

Plaintiff saw Dr. Stuart Trager on July 23, 2007, with
complaints of bilateral hand numbness, weakening, and nocturnal
pain. (R. 581.) Plaintiff also had left trigger thumb and right
index trigger finger, with diffuse tenderness at the A-1 pulley
levels. (R. 581.) Tinel's, Phalan's, and carpometacarpal grind
tests were positive bilaterally. (R. 581.) Dr. Trager diagnosed
CTS, and suggested injections as she had delivered nineteen days

18

earlier.  (R. 581.)

On August 14, 2007, Plaintiff had surgery for right CTS and right thumb trigger finger.  (R. 566-67.)  She reported being "quite pleased with her progress" by August 27, 2007, experiencing no numbness, tingling or locking at that time.  (R. 563.)

Plaintiff had surgery for left carpal tunnel syndrome and left thumb trigger finger on September 11, 2007.  (R. 558-59.)  By September 26, she was "doing quite well".  (R. 491, R. 557.)  Her numbness and tingling had "markedly improved" and her wounds had "healed nicely".  (R. 491.)  Dr. Trager instructed her to wear bicycle gloves.  (R. 491.)

On October 4, 2007, Plaintiff saw Dr. Rhyme with complaints of back and neck pain.  (R. 384.)  Cervical spine x-rays revealed "minimal" degenerative change.  (R. 393.)  Dr. Rhyme recommended Tylenol, as Plaintiff was breast-feeding.  (R. 384.)

Plaintiff saw Dr. Jennifer Lane Vanderbeck on October 17, 2007, with complaints of shoulder pain and difficulty lifting her three-month-old child.  (R. 555.)  She had pain with overhead activities and backward reaching, but denied locking, popping, or numbness or tingling into the hand.  (R. 555.)  Upon examination, she had 170 degrees of forward elevation with pain, symmetric external rotation to forty-five degrees, and internal rotation to

T10.  (R. 555.)  She had tenderness to palpation at the acromioclavicular (AC) joint, and pain with supraspinatus testing but no weakness and normal external rotation strength.  (R. 555.) X-rays revealed changes consistent with chronic impingement.  (R. 555.)  Dr. Vanderbeck diagnosed right rotator cuff tendonitis, provided a cortisone injection and suggested physical therapy.  (R. 555.)

On October 19, 2007, Plaintiff told Dr. Trager that she was "significantly better" after surgery.  (R. 554.)  Upon examination, her scars were well-healed but somewhat tender and inflamed.  (R. 554.)  She had not yet obtained bicycle gloves.  (R. 554.)  Dr. Trager noted that she had a three-month-old child at home, which was "likely the cause of her aggravation".  (R. 554.)

Dr. Stephen Soloway completed an assessment on November 2, 2007 in which he noted that Plaintiff had full range of motion in her shoulders, elbows, wrists, knees, hips, ankles, and cervical spine. (R. 322-23.)  She had some weakness, with strength assessed at 3/5 bilaterally; however, she was able to squat and walk on heels and toes, and had no sensory or reflex loss on either side.  (R. 323.) She could walk at a reasonable pace, and had no other limitations. (R. 323-24.)

On November 11, 2007, Plaintiff saw Dr. Vanderbeck with

complaints of shoulder pain.  (R. 553.)  She said the injection had helped, but not completely, and that her pain was worse when "lifting young children at home".  (R. 553.)  Dr. Vanderbeck noted tenderness to palpation at the AC joint, and with cross-body adduction.  (R. 553.)  She also had pain and "a little bit" of weakness with supraspinatus testing.  (R. 553.)  Range of motion was to 170 degrees of forward elevation, with forty-five degrees of external rotation, and internal rotation to T10.  (R. 553.)  Dr. Vanderbeck gave Plaintiff samples of Celebrex and a handout of shoulder exercises, as insurance problems had delayed physical therapy.  (R. 553.)

Plaintiff began physical therapy on November 21, 2007, after cancelling two prior evaluations.  (R. 521, 548.)  She complained of diffuse right shoulder pain following a car accident in December 2006.  (R. 550.)  She attended seven sessions, did not return, and was discharged on January 24, 2008.  (R. 521.)

On November 28, 2007, Plaintiff complained of neck and shoulder pain; she also reported having surgery for uterine prolapse the previous week.  (R. 544.)  She had restricted range of motion of the cervical spine; tenderness to palpation on the right AC joint; and pain and "a little bit" of weakness with supraspinatus testing.  (R. 544.)  She also had full range of shoulder motion with no evidence

of instability.  (R. 544.)  Dr. Vanderbeck diagnosed right shoulder rotator cuff tendinitis, AC joint arthritis, and cervical pain.  (R. 544.)

Dr. Vanderbeck also completed a public assistance examination report on November 28, 2007.  (R. 546-47.)  She diagnosed right shoulder rotator cuff tendinitis and right AC joint arthritis, described both conditions as stable, and reported that Plaintiff had decreased range of motion in her neck and right shoulder.  (R. 546.)  Dr. Vanderbeck opined that Plaintiff could not do repetitive overhead reaching, or overhead reaching with more than five pounds, but noted no other limitations.  (R. 546.)  She said Plaintiff was medically cleared to participate voluntarily in part-time employment, and opined that Plaintiff's disability would last more than thirty days but less than ninety days.  (R. 547.)  She further opined that Plaintiff's functional capacity was adequate to conduct normal activities.  (R. 547.)

On November 29, 2007, Plaintiff saw Dr. Trager with complaints of recent finger lock and nodules on her right small and ring fingers, and some pain at the base of her left incision.  (R. 542.)  Upon examination, she had small seed ganglia on the small and ring fingers but full range of motion and no triggering.  (R. 542.)  Dr. Trager injected her hand, and felt the incision pain would resolve with time.

22

(R. 542.)

Plaintiff saw Dr. Vanderbeck on December 13, 2007, with complaints of shoulder pain.  (R. 538.)  She had active range of motion with elevation to 160 degrees, and external rotation to six degrees.  (R. 538.)  Right shoulder MRI revealed subacromial-subdeltoid bursitis and supraspinatus rotator cuff tendinosis.  (R. 534.)

Plaintiff also saw Dr. Trager on December 13, 2007, and complained of new "locking and catching" of her right small and long fingers, as well as a ganglion cyst.  (R. 539.) She asked about surgery, which was performed on December 27, 2007, for right long ring and small finger triggers, and ring and small finger tendon sheath cysts.  (R. 526-27, 539.)

Plaintiff sought treatment for her right knee on January 9, 2008, following a bus accident in December 2006.  (R. 523-24.)  She reported painful "popping" and difficulty with stairs, but denied numbness or tingling.  (R. 523.)  Range of motion was to 130 degrees, with crepitation but no effusion or instability.  (R. 523.) Patellar apprehension sign was positive, and she had pain with patellofemoral loading.  (R. 523.)  McMurray test for meniscus tear was negative, her leg was neurovascularly intact, and x-rays revealed no abnormality.  (R. 523.)

23

On January 23, 2008, Plaintiff reported that her range of motion was "gradually improving" following trigger finger surgery, although she could not yet flex her fingertips to her palms.  (R. 522.)  Dr. Trager recommended physical therapy.  (R. 522.)

Plaintiff said her knee pain was worse on February 1, 2008, although she was not limping.  (R. 519.)  She had superficial swelling with range of motion to 110 degrees.  (R. 519.)  Patellar apprehension sign was positive, and she had pain with patellofemoral loading and mild lateral joint line tenderness.  (R. 519.)  Her condition remained unchanged on February 28.  (R. 514.)  Right knee MRI revealed mild (grade two) degeneration of the medial meniscus, and edema adjacent to the tibial collateral ligament.  (R. 507.)

Plaintiff had shoulder surgery on March 4, 2008, for right AC joint arthritis and impingement syndrome.  (R. 498-99.)  By March 13, Plaintiff's shoulder was "healing nicely" and "not having any problems", although her pain returned in October of that year.  (R. 497, 480.)  However, at the March 13th appointment, she complained of knee pain.  (R. 497.)  Dr. Vanderbeck advised physical therapy, and told Plaintiff she could drive.  (R. 497.)

Plaintiff began physical therapy for her right shoulder and knee on March 26, 2008.  (R. 494.)  She complained of right knee pain with ambulation and right knee swelling in the morning.  (R. 495.)  Her

24

gait was antalgic.  (R. 495.)  Hip, knee, and ankle ranges of motion
were within functional limits, except that right knee extension was
to zero degrees and right knee flexion was limited to eighty-
five degrees active range of motion and ninety-five degrees passive.
(R. 495.)  She had minimal tightness in her legs, and some tenderness
to palpation on the right.  (R. 495.)  Strength was 3+/5 to 4/5
throughout.  (R. 495.)  Examination of her lower extremities was
otherwise unremarkable.  (R. 495.)  Her right shoulder was painful
and tender to palpation following surgery three weeks earlier, with
limited range of motion.  (R. 496.)

On April 8, 2008, Plaintiff described her shoulder as "much
better"; she was doing "quite well" in physical therapy and had nearly
full range of motion, with no pain or weakness.  (R. 493.)  However,
she complained of knee pain for which she received an injection.  (R.
493.)

On April 23, 2008, Plaintiff saw Dr. Trager with complaints of
right hand pain.  (R. 490, 492.)  She said she was "doing better"
until her shoulder surgery.  (R. 490.)  Upon examination, her wounds
were well healed with no contractures, nodules or locking.  (R. 490.)
She had full active flexion, but lacked the last half-centimeter of
positive motion.  (R. 490.) Dr. Trager recommended continued
exercise and physical therapy.  (R. 490.)

On May 7, 2008, Plaintiff told Dr. Vanderbeck that physical therapy had helped "significantly." (R. 488.) She was "not having any shoulder problems" and her right knee was "significantly better". (R. 488.) She had full painless range of motion of the right shoulder, and no pain or weakness on rotator cuff testing. (R. 488.) She also had full range of motion of the knee, with "very mild" tenderness. (R. 488.)

Plaintiff returned to Dr. Trager on June 23, 2008, complaining that her hands felt stiff. (R. 487.) She had subjectively decreased sensibility in the small, ring, and long fingers, but full active and passive motion. (R. 487.) Dr. Trager noted a possible retained suture. (R. 487.)

Plaintiff saw Dr. Sharan Rampal on June 27, 2008 with complaints of aching soreness in the hands exacerbated by manual activity. (R. 485.) Upon examination, she was alert, oriented and appropriate. (R. 485.) She could remember three out of three objects in three minutes, and remote memory was normal as well. (R. 485.) Gait and muscle tone were normal, with full (5/5) strength bilaterally, no atrophy, and straight leg raising to ninety degrees. (R. 485.) Tinel's sign was positive bilaterally, but Phalan's sign was negative. (R. 485.) Plaintiff had some reduced sensation on the radial-palmar aspect of both hands, and mild patchy tenderness over

26

her wrists and elbows.  (R. 485.)  Dr. Rampal assessed unexplained residual symptoms following carpal tunnel release, and recommended further testing.  (R. 485.) There was "significant improvement" compared to pre-operative studies in April 2007, but the EMG and NCV testing revealed moderate right and mild left median CTS. (R. 460-61, R. 463-64.)

On July 18, 2008, Dr. Trager noted a small area of inflammation consistent with a retained portion of suture, and scheduled removal for July 31, 2008.  (R. 482-84.)  On September 22, 2008, however, Plaintiff said she was unable to get her suture removed because she was pregnant.  (R. 482-83.)  Removal was rescheduled for October. (R. 482.)

On October 6, 2008, Plaintiff saw Dr. Vanderbeck with complaints of right shoulder and right knee pain.  (R. 480.)  She had some right shoulder stiffness on examination.  (R. 480.)  Her right knee had a "slight" limitation in flexion, with tenderness and pain with patellofemoral loading.  (R. 480.)  Dr. Vanderbeck recommended that she return to physical therapy and discussed possible surgery.  (R. 480.)

Dr. Vanderbeck completed a public assistance examination report on October 23, 2008.  (R. 476.)  Plaintiff's primary diagnoses included right shoulder impingement and AC joint arthritis, and Dr.

27

Vanderbeck also noted a right knee meniscal tear.  (R. 476.)  Each condition was present since December 2006, and Dr. Vanderbeck assessed that Plaintiff's shoulder conditions were improving, while her knee injury was progressive.  (R. 476.)  Plaintiff had stiffness in her right knee and shoulder, but no muscle weakness, or motor, reflex or sensory loss.  (R. 477.)  She was receiving physical therapy.  (R. 476.)  Dr. Vanderbeck stated that a right knee partial meniscectomy could either improve functioning, or correct or control her condition.  (R. 476-77.)

Dr. Vanderbeck indicated that Plaintiff was ambulatory, but had limitations in walking, climbing, and stooping, and should not lift more than fifty pounds with her right side.  (R. 476.)  The doctor checked boxes to indicate that Plaintiff could not work full time, and that her functional capacity allowed her to perform little or none of her usual occupations or self-care.  (R. 477.)  However, Dr. Vanderbeck stated that she was medically cleared to participate voluntarily in part-time employment, provided she did not squat or lift more than fifty pounds.  (R. 477.)  She opined that Plaintiff's incapacity had begun in December 2006 and would last until January 2009.  (R. 477.)

Plaintiff returned to Dr. Trager for a repeat evaluation on October 27, 2008, after having her suture removed.  (R. 475; see R.

28

482, scheduling removal for October 14, 2008.)  She had no complaints
and was able to make a full fist.  (R. 475.)  Plaintiff had right
knee surgery on November 14, 2008.  (R. 468-69.)  Plaintiff's
medical records end here.

## II.  DISCUSSION

### A. Standard of Review

When reviewing a final decision of the Social Security
Commissioner, the Court must uphold the Commissioner's factual
decisions if they are supported by "substantial evidence."  42
U.S.C.§§ 405(g), 1383(c)(3); Knepp v. Apfel, 204 F.3d 78, 83 (3d Cir.
2000).  "Substantial evidence" means "'more than a mere scintilla.
It means such relevant evidence as a reasonable mind might accept
as adequate to support a conclusion.'"  Richardson v. Perales, 402
U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S.
197, 229 (1938)); Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999).
Where such evidence supports the ALJ's findings of fact, the Court
is bound by the Commissioner's findings, "even if [it] would have
decided the factual inquiry differently."  Fargnoli v. Massanari,
247 F.3d 34, 38 (3d Cir. 2001) (citing Hartranft v. Apfel, 181 F.3d
358, 360 (3d Cir. 1999)).  Thus, this Court must "review the evidence
in its totality, but where it is susceptible of more than one rational
interpretation, the Commissioner's conclusion must be upheld."

29

_Ahearn v. Comm'r of Soc. Sec._, 165 Fed. Appx. 212, 215 (3d Cir. 2006) (citing _Daring v. Heckler_, 727 F.2d 64, 70 (3d Cir. 1984); _Monsour Med. CR. v. Heckler_, 806 F.2d 1185, 1190-91 (3d Cir. 1986)).

Where the Commissioner is faced with conflicting evidence, however, "he must adequately explain in the record his reason for rejecting or discrediting competent evidence."  _Ogden v. Bowen_, 677 F.Supp. 273, 278 (M.D. Pa. 1987) (citing _Brewster v. Heckler_, 786 F.2d 581 (3d Cir. 1986)).  Stated differently,

> "[U]nless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'"

_Gober v. Matthews_, 574 F.2d 772, 776 (3d Cir. 1978) (quoting _Arnold v. Sec'y of Health, Ed. & Welfare_, 567 F.2d 258, 259 (4th Cir. 1977)); _see also_ _Guerrero v. Comm'r of Soc. Sec._, Civ. No. 05-1709, 2006 WL 1722356, *3 (D.N.J. June 19, 2006) (stating that it is the ALJ's responsibility "to analyze all the evidence and to provide adequate explanations when disregarding portions of it"), _aff'd_, 249 Fed. Appx. 289 (3d Cir. 2007).

While "[t]here is no requirement that the ALJ discuss in [her] opinion every tidbit of evidence included in the record," _Hur v. Barnhart_, 94 Fed. Appx. 130, 133 (3d Cir. 2004), the ALJ must review

and consider all pertinent medical and non-medical evidence and "explain [any] conciliations and rejections." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 122 (3d Cir. 2000); see also Fargnoli, 247 F.3d at 42 ("Although we do not expect the ALJ to make reference to every relevant treatment note in a case where the claimant . . . has voluminous medical records, we do expect the ALJ, as the factfinder, to consider and evaluate the medical evidence in the record consistent with his responsibilities under the regulations and case law.").

In addition to the substantial evidence inquiry, this Court must also review whether the administrative determination was made upon application of the correct legal standards. See Sykes v. Apfel, 228 F.3d 259, 262 (3d Cir. 2000); Friedberg v. Schweiker, 721 F.2d 445, 447 (3d Cir. 1983). The Court's review of legal issues is plenary. Sykes, 228 F.3d at 262 (citing Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 431 (3d Cir. 1999)).

**B. "Disability" Defined**

The Social Security Act defines "disability" as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42

31

U.S.C. § 1382c(a)(3)(A).  The Act further states,

> [A]n individual shall be determined to be under a disability
> only if his physical or mental impairment or impairments are
> of such severity that he is not only unable to do his previous
> work but cannot, considering his age, education, and work
> experience, engage in any other kind of substantial gainful work
> which exists in the national economy, regardless of whether such
> work exists in the immediate area in which he lives, or whether
> a specific job vacancy exists for him, or whether he would be
> hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has promulgated a five-step, sequential

analysis for evaluating a claimant's disability, as outlined in 20

C.F.R. § 404.1520(a)(4)(i-v).  In Plummer, 186 F.3d at 428, the Third

Circuit set out the Commissioner's inquiry at each step of this

analysis:

> In step one, the Commissioner must determine whether the
> claimant is currently engaging in substantial gainful activity.
> 20 C.F.R. § 1520(a).  If a claimant is found to be engaged in
> substantial activity, the disability claim will be denied.
> Bowen v. Yuckert, 482 U.S. 137, 140 (1987).  In step two, the
> Commissioner must determine whether the claimant is suffering
> from a severe impairment.  20 C.F.R. § 404.1520(c).  If the
> claimant fails to show that her impairments are "severe," she
> is ineligible for disability benefits.
>       In step three, the Commissioner compares the medical
> evidence of the claimant's impairment to a list of impairments
> presumed severe enough to preclude any gainful work.   20 C.F.R.
> § 404.1520(d).  If a claimant does not suffer from a listed
> impairment or its equivalent, the analysis proceeds to steps
> four and five.   Step four requires the ALJ to consider whether
> the claimant retains the residual functional capacity to
> perform her past relevant work.   20 C.F.R. § 404.1520(d).   The
> claimant bears the burden of demonstrating an inability to
> return to her past relevant work.   Adorno v. Shalala, 40 F.3d

43, 46 (3d Cir. 1994).

  If the claimant is unable to resume her former occupation, the evaluation moves to the final step.  At this stage, the burden of production shifts to the Commissioner, who must demonstrate the claimant is capable of performing other available work in order to deny a claim of disability.  20 C.F.R. § 404.1520(f).  The ALJ must show there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and residual functional capacity.  The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether she is capable of performing work and is not disabled.  See 20 C.F.R. § 404.1523.  The ALJ will often seek the assistance of a vocational expert at this fifth step.  See Podedworny v. Harris, 745 F.2d 210, 218 (3d Cir. 1984).

## C. **Analysis**

Plaintiff argues that the ALJ erred in concluding that she is not disabled and seeks a reversal of his decision.  She advances the following arguments: (1) the ALJ failed to evaluate all of her impairments at step two, and erred by not finding them "severe", (2) the ALJ failed to consider her obesity, (3) the ALJ failed to properly determine her residual functional capacity, (4) the ALJ failed to properly evaluate and weigh all of the medical evidence of record; and (5) the ALJ improperly discounted Plaintiff's testimony of disabling pain and limitations.

## 1. The ALJ's Determinations at Step Two

Plaintiff first argues that the ALJ erred by not crediting all of her severe impairments, which included her cervical condition,

adjustment disorder, right shoulder condition, right knee condition, elbow condition, hypertension, bilateral hand condition, and obesity.  However, the ALJ found in Plaintiff's favor at Step Two, concluding that she suffered from a severe back disorder.  Thus, "even if [the ALJ] had erroneously concluded that some of her other impairments were non-severe, any error was harmless."  See Salles v. Comm'r of Soc. Sec., 229 Fed. Appx. 140, 145 n.2 (3d Cir. 2007) (citing Rutherford v. Barnhart, 339 F.3d 546, 553 (3d Cir. 2005)).

### 2. Consideration of Obesity

Although Plaintiff now argues that the ALJ erred by failing to consider her obesity, she neither identified any limitations due to her obesity when she applied for benefits (R. 165), nor when she testified at the administrative hearing, (R. 40-57).  In fact, she still has not identified any additional limitations attributable to obesity or explained how they would prevent her from performing the unskilled, sedentary work identified by the ALJ at step five.  (Pl.'s Br. 12-14.)  While the ALJ did not explicitly consider Plaintiff's obesity, he did rely upon Dr. Soloway's reports, which mentioned Plaintiff's condition and thus put him on notice of the impairment. (R. 29.)  This constituted a satisfactory, albeit indirect, consideration of Plaintiff's condition.  See Rutherford, 399 F.3d at 553 (citing Skarbek v. Barnhart, 390 F.3d 500, 504 (7th Cir.

2004)).  Moreover, Plaintiff never argued that her obesity would impact her job performance, and thus a remand would not affect the outcome of this matter anyway.  See Rutherford, 339 F.3d at 553 (holding that remand on obesity issue was not required where it "would not affect the outcome").

### 3. Consideration of the Evidence & Credibility Findings

The Court considers Plaintiff's remaining arguments together, i.e., whether the ALJ failed to properly weigh all of the medical evidence of record and determine her RFC, and whether the ALJ properly discounted Plaintiff's testimony of disabling pain and limitations. Plaintiff argues that the ALJ did not give appropriate weight to several of her conditions, including her hand and shoulder impairments.  Defendant responds that the ALJ correctly concluded that Plaintiff's other impairments did not cause additional restrictions, because they were either temporary, intermittent, or unsupported by the record.

When an ALJ renders his decision, he must provide sufficient explanation of his final determination so the reviewing court has the benefit of the factual basis underlying the ultimate disability finding.  Cotter v. Harris, 642 F.2d 700, 705 & n.7 (3d Cir. 1981), reh'g den'd, 650 F.2d 481 (1981); see also Fargnoli v. Massanari, 247 F.3d 34, 42 (3d Cir. 2001); Morales v. Apfel, 255 F.3d 310, 317

(3d Cir. 2000); <u>Mason v. Shalala</u>, 994 F.2d 1058, 1066 (3d Cir. 1993).
He must provide sufficient discussion to allow the court to determine
whether any rejection of potentially pertinent, relevant evidence
was proper.  <u>Burnett v. Comm'r of Soc. Sec.</u>, 220 F.3d 112, 121 (3d
Cir. 2000); <u>Cotter</u>, 642 F.2d at 706-07.  Moreover, "[a] cardinal
principle guiding disability eligibility determinations is that the
ALJ accord treating physicians' reports great weight, especially
'when their opinions reflect expert judgment based on a continuing
observation of the patient's condition over a prolonged period of
time.'"  <u>Morales</u>, 225 F.3d at 317 (citations omitted).

<u>Plaintiff's Shoulder Impairment</u>

Turning first to Plaintiff's shoulder impairment, while the ALJ
provided significant analysis of the record, he did not properly
consider an examination report by Plaintiff's treating physician
concerning Plaintiff's shoulder impairment.  He also did not
adequately explain his disregard for other treating records and
Plaintiff's own testimony on this matter.  Dr. Vanderbeck, one of
Plaintiff's treating physicians at Cumberland Orthopedic, completed
an examination report on October 23, 2008, for the New Jersey Division
of Family Development, in which she discussed Plaintiff's shoulder
problem.  (R. 476.)  In her report, she diagnosed Plaintiff with
shoulder impingement and acromioclavicular ("AC") joint arthritis,

noting that Plaintiff had had this problem since December 2006, and
that she expected the impairment to last "more than 12 months."  (R.
476-77.)  She reported that the impairment caused Plaintiff to have
difficulty lifting things and that she could not lift more than 50
pounds.  Notably, she described Plaintiff's functional capacity as
"adequate to perform only little or none of the duties of usual
occupation or of self care."  (R. 476.)  In his assessment of
Plaintiff's RFC, the ALJ dismissed this report, noting that a second,
undated report by Dr. Vanderbeck was "apparently filled out" after
it and should thus supersede the first report.  (R. 30.)  In the
undated report, Dr. Vanderbeck discussed a "rotator cuff tendonitis"
as well as the "ACJ OA" (presumably meaning AC Joint Osteoarthritis).
(R. 546.)  She opined that Plaintiff's shoulder disability would
only last between 30 and 90 days and that her functional capacity
was "adequate to conduct normal activities despite handicap,
discomfort, or limited mobility of one or more joints."  (R. 30.)
Upon careful evaluation of both reports, however, there is no reason
to think that this second report was written after the October 23,
2008 report.  In fact, the opposite is true.  The records from
Cumberland Orthopedic are generally filed in reverse chronological
order, and the second report is in the section pertaining to November
2007, well after the October 2008 section of the record, where the

first report is located.  Further, the second report opines that the shoulder issue arose on November 28, 2007, and will last between 30 and 90 days, with the anticipated end date left blank.  (R. 547.) Clearly, Dr. Vanderbeck filled out this report before the 30-90 day period had passed following November 28, 2007.  If she wrote this after October 2008, more than eleven months would have already passed since November 2007, and the disability would have therefore already lasted well over the estimated 30-90 days.  This is an important distinction, since, as the ALJ notes, these are the only function-by-function assessments of Plaintiff's abilities or limitations from any treating physician, and given that the October 2008 report deemed Plaintiff's shoulder impairment to be much more debilitating than the earlier report.  (R. 30.)  Thus, the ALJ should have properly considered the October 2008 report by Plaintiff's treating physician as superseding the earlier report, which underestimated the length and degree of her shoulder impairment.  The ALJ also appears to have disregarded Plaintiff's treating records, which reflect that her shoulder pain persisted following surgery.  (R. 480.)  The ALJ's opinion instead suggests that surgery resolved this problem.  (R. 26.)  Thus, it is unclear whether the ALJ adequately considered and rejected certain evidence or merely disregarded it.

Plaintiff also argues that the ALJ improperly discounted her testimony regarding her shoulder limitations and pain.  At the administrative hearing, she reported that she had recently had surgery on her right shoulder, but it was now worse than before.  (R. 50-51.)  She also believed that her shoulder problems were due to her arthritis.  (R. 50-51.)  She stated that it is difficult for her to lift things and perform tasks such as getting dressed, putting on underwear, and doing her hair.  (R. 51.)

"An ALJ must give serious consideration to a claimant's subjective complaints of pain, even where those complaints are not supported by objective evidence."  Shalala, 994 F.2d at 1067 (citing Ferguson v. Schweiker, 765 F.2d 31, 37 (3d Cir. 1985)).  "Where medical evidence does support a claimant's complaints of pain, the complaints should then be given 'great weight' and may not be disregarded unless there exists contrary medical evidence."  Id. at 1067-68 (citations omitted). Nevertheless, "[a]lthough the ALJ may weigh the credibility of the evidence, he must give some indication of the evidence that he rejects and his reason(s) for discounting that evidence." Fargnoli, 247 F.3d at 43.

The ALJ dismissed Plaintiff's testimony concerning her shoulder pain and limitations, explaining simply that while "the claimant testified that she experienced difficulty lifting," this allegation

39

was "quite extreme" and "not supported by the medical evidence in the record." (R. 30.)  However, the ALJ did not cite to any specific evidence in the record nor elaborate on Plaintiff's credibility with respect to her shoulder injury other than to cite reports of Plaintiff's daily activities prior to her shoulder surgery and subsequent impairment in 2008 and 2009.  The ALJ relies on the fact that Plaintiff was reported to be able to pick up her baby and perform some housework, but appears to have disregarded Plaintiff's repeated complaints to her treating physician, Dr. Vanderbeck, in October and November 2007, that her shoulder pain made it difficult for her to lift her three-month-old infant.  (R. 553, 555.)  The ALJ also did not acknowledge the fact that as part of her appeal, Plaintiff submitted an amended disability report on October 30, 2008, which listed her shoulder impairment as a new problem.  (R. 219-26.)

It is the responsibility of the ALJ to weigh the evidence and make determinations on contradicting evidence.  Cotter v. Harris, 642 F.2d 700, 705 (3d Cir. 1981), reh'g den'd, 650 F.2d 481 (3d Cir. 1981) ("[W]e need from the ALJ not only an expression of the evidence s/he considered which supports the result, but also some indication of the evidence which was rejected.  In the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored.).  The ALJ must explain

40

how he came to his conclusions on Plaintiff's shoulder injury and why he discounted relevant medical records and Plaintiff's testimony.  Indeed, had the ALJ given due consideration to Dr. Vanderbeck's October 2008 report, his analysis of Plaintiff's complaints of pain might have been significantly affected.  The Court remands this case for further discussion on these issues related to Plaintiff's RFC and the credibility of her testimony at the administrative hearing.

<u>Hand Impairment</u>

Similarly, Plaintiff argues that in determining her RFC, the ALJ failed to properly consider the medical records as well as her testimony concerning her hand impairments.  She also claims the ALJ failed to fully account for the extent of her hand problems by withdrawing them from the hypothetical question posed to the vocational expert ("VE").

The record reflects that Plaintiff suffered from carpal tunnel syndrome and ganglion cysts.  She reported numbness and stiffness in her hands, which were exacerbated by manual activity, even after carpal tunnel surgery.  (R. 485.)  Plaintiff saw Dr. Trager on June 23, 2008, complaining of "decreased sensibility in the small, ring, and long finger," and clumsiness and stiffness in her hands.  (R. 487.)  Dr. Trager recommended Plaintiff to Dr. Sharan Rampal for EMG

and nerve conduction studies.  (R. 487, 485.)  Subsequently, on June 27, 2008, Dr. Rampal evaluated Plaintiff, who described aching soreness in her hands.  (R. 485.)  Dr. Rampal's impression was that these symptoms were residual effects of Plaintiff's carpal tunnel release surgery.  (R. 486.)  After conducting an EMG, Dr. Rampal noted "significant improvement" compared to the pre-operative study, but also reported "moderate Right and mild Left residual Median neuropathy across the Carpal tunnels."  (R. 461.)  In a letter to Dr. Trager, Dr. Rampal described her impression as "unexplained residual symptoms" for Carpal Tunnel release.  (R. 486.)  On July 18, 2008, Dr. Trager noticed inflammation in Plaintiff's hand due to a retained suture from prior hand surgery, so Plaintiff underwent an operation to have the suture removed.  (R. 484.)  She was subsequently able to make a full fist (R. 475), although it is unclear whether her neuropathy resolved.  Plaintiff's medical records end here.  However, Plaintiff subsequently filed an amended disability report on October 30, 2008, in which she complained of pain and lack of feeling in her hands, which caused her to need help washing her hair and getting dressed.  (R. 219-26.)

At the administrative hearing, Plaintiff testified that even after her hand surgery for carpal tunnel syndrome, she still experiences numbness, stiffness, and charley horses.  (R. 49-50.)

42

According to Plaintiff, this condition has made it difficult for her to drive, so she only drives short distances, such as to church or the post office.  (R. 45.)  She also reported difficulty picking up items like milk or a pot because she does not feel the object due to numbness.  (R. 50.)  She stated that due to the discomfort in her wrists and the stiffness of her fingers, she does not think she could pack or stuff peppers again.  (Id.)  She also testified that she has been diagnosed with arthritis.  (Id.)

The ALJ determined that Plaintiff's allegations were "quite extreme" and "not supported by the medical evidence in the record," although he did not cite to any contrary medical evidence other than reports from 2006 and 2007, which predate Plaintiff's post-surgery symptoms.  (R. 30.)  He also cited her ability to drive, which, he noted, requires a person to "use the hands with some dexterity."  (R. 31.)  He did not discuss, however, whether her ability to drive only short distances suggested a lack of such dexterity.

The ALJ also determined that Plaintiff's hand impairment was a "temporary" condition, relying on Dr. Rampal's comment that Plaintiff had made "significant improvement" as compared to her pre-operative condition, but ignoring the same doctor's reports that Plaintiff continued to have unexplained neuropathy across the carpal tunnels.  (R. 461, 486.)  The ALJ also relied on Dr. Trager's

43

assessment that Plaintiff was able to make a "full fist" after removing the suture (R. 475), but did not explain how the ability to make a full fist indicated that Plaintiff's carpal tunnel syndrome had resolved.

Nevertheless, when crafting his hypothetical to the VE, the ALJ first included a limitation addressing Plaintiff's hand impairment. He asked the VE to consider jobs given Plaintiff's profile that required only "occasional fine fingering and handling." (R. 60-61.) Only after the VE answered that there were no jobs given the restriction on occasional handling and fine fingering did the ALJ remove this limitation. The VE then listed two jobs in the national economy that would fit Plaintiff's profile: the occupation of a nut sorter and a final assembler of eyeglasses. (R. 61.) Notably, the ALJ did not explain what components of the medical evidence he accepted or rejected in formulating this hypothetical.

An ALJ may not "employ [his or] her own expertise against that of a physician who presents competent medical evidence." Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999) (citing Ferguson v. Schweiker, 765 F.2d 31, 37 (3d Cir. 1985)). "The ALJ must consider all the evidence and give some reason for discounting the evidence she [or he] rejects." Id. (citing Stewart v. Sec'y of H.E.W., 714 F.2d 287, 290 (3d Cir. 1983)). In other words, he must "do more than

simply state ultimate factual conclusions.  The ALJ must include subsidiary findings to support the ultimate findings" and must provide "not only an expression of the evidence s/he considered which supports the result, but also some indication of the evidence which was rejected.  In the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored."  Stewart, 714 F.2d at 290 (quotations omitted). Here, the hypothetical suggests that the ALJ disregarded Dr. Rampal's opinion that Plaintiff continued to have unexplained residual carpal tunnel symptoms.  Perhaps the ALJ did not credit this report in light of Plaintiff's subsequent reports from Dr. Trager.  Where there is such conflicting probative evidence in the record, courts have recognized a "particularly acute need for an explanation of the reasoning behind the ALJ's conclusions, and will vacate or remand a case where such an explanation is not provided."  Fargnoli, 247 F.3d at 42.  Moreover, the ALJ also did not adequately explain why Plaintiff's complaints of numbness and pain in her hands were "extreme" and not supported by the record.  It is therefore unclear whether the ALJ should have submitted the hand impairment to the vocational expert in order to accurately convey all of Plaintiff's credibly established limitations.  Rutherford v. Barnhart, 399 F.3d 546, 554 (3d Cir. 2005) (citing Plummer, 186 F.3d at 431) (finding

that while the ALJ need not submit to the vocational expert every alleged impairment, he must accurately convey all of a claimant's credibly established limitations).

It is impossible to properly review the ALJ's decision because the Court cannot tell if significant probative evidence was considered and not credited or simply ignored. The Court cannot fulfill its duty of review absent sufficient explanation of the ALJ's credibility determinations with regard to Plaintiff's testimony and its rejection of certain medical opinions.  The Court must therefore remand this matter to permit the ALJ to either credit such testimony and opinions or provide an adequate explanation for rejecting them.[1]

**III. CONCLUSION**

Accordingly, for the reasons discussed above, the decision below is vacated, and this case is remanded to the ALJ for further consideration consistent with this opinion. An accompanying Order will issue this date.

Dated: September 16, 2011            s/Renée Marie Bumb
                                     RENÉE MARIE BUMB
                                     UNITED STATES DISTRICT JUDGE

---

[1] Given the Court's decision to remand this matter, it need not reach Plaintiff's remaining arguments.